MÉNDEZ & COMPANY, INC., demandante y apelada, *v.* SECRETARIO DE HACIENDA, demandado y apelante.

Número 11220.
*Sometido:* 8 de noviembre de 1954. *Resuelto:* 31 de enero de 1955.

*Hon. Secretario de Justicia José Trías Monge* y *J. C. Santiago Matos, Procurador Auxiliar,* abogados del apelante; *Luis E. Dubón* y *R. García Cintrón,* abogados de la apelada.

El Juez Asociado Señor Marrero emitió la opinión del Tribunal.

En su planilla de contribución sobre ingresos correspondiente al año contributivo 1943 la demandante Méndez & Co., Inc., reclamó como deducción la suma de $30,000 pagada por ella a la Oficina de Administración de Precios.[1]   El Tesorero rechazó la deducción así reclamada y notificó una deficiencia a la contribuyente.   Cumplidos los trámites administrativos,[2] la contribuyente acudió ante el antiguo Tribunal de Contribuciones de Puerto Rico.[3] Visto el caso, ese tribunal dictó sentencia declarando con lugar la demanda y anulando la deficiencia determinada por el Secretario demandado.   Dicha sentencia se funda en una opinión en la que se dan por probados los siguientes hechos:

"(1) En junio 21 de 1943 la Oficina de Administración de Precios dirigió una comunicación a la demandante manifestándole que una investigación había revelado violaciones de precios, e invitándola a una conferencia a ser efectuada el 25 de dicho mes.   En 10 de julio de 1943 la referida Oficina de Administra-

---

[1] En adelante nos referiremos a la Oficina de Administración de Precios como la "O.A.P.".

[2] Véase la sec. 57 (*a*) de la Ley de Contribuciones Sobre Ingresos (núm. 74 de 6 de agosto de 1925, pág. 401), según fué enmendada por la Ley núm. 230 de 10 de mayo de 1949, pág. 707.

[3] A virtud de la Ley núm. 22 de 24 de julio de 1952 (Ses. extr., pág. 93), el Tribunal de Contribuciones pasó a formar parte integrante del Tribunal Superior de Puerto Rico.

ción de Precios envió otra comunicación al abogado de la demandante, manifestandole que de acuerdo con lo convenido en relación con una transacción de los derechos del Administrador a una acción de danos triples por violacion de los reglamentos, se incluia una lista conteniendo las facturas en cada violación para que la demandante determinara el precio máximo cargado durante el periodo de abril 10 a mayo 10 de 1942. El período de abril 10 a mayo 10 de 1942 fué el período básico fijado por la Administración para determinar los precios máximos a ser cargados a cada renglón.

"(2) En agosto 13 de 1943 la Oficina de Administración de Precios se dirigió de nuevo a la demandante a través de su abogado confirmando el acuerdo de transacción relacionado con la acción de triple daño del Administrador de Precios. Se le informaba que después de haber discutido con miembros de la firma demandante las varias violaciones alegadas y discutido el asunto con el Director, el abogado principal y otros miembros del 'staff', se había acordado que la Oficina aceptaría en pago total de la acción por triples daños, por todas las violaciones o alegadas violaciones incurridas, la cantidad de $30,000. Se advirtió que esta transacción no implicaba una renuncia de la Oficina de Administración de Precios de su derecho a instituir procedimientos legales por las violaciones de sus reglamentos, excepto que el derecho del Administrador de Precios a radicar una acción civil de daños triples basada en dichas violaciones quedaba renunciado. En agosto 16 de 1943 la demandante envió a la Oficina de Administración de Precios un cheque a favor de Estados Unidos por la cantidad de $30,000 en armonía con lo anteriormente expuesto, aclarando que dicho pago no implicaría una aceptación por la demandante de haber violado *intencionalmente* los reglamentos, ni implicaría la renuncia de otros derechos y privilegios de la demandante bajo leyes del Congreso.

"(3) En adición a los hechos anteriormente expuestos que surgen de la prueba documental, la evidencia demostró que allá para el año 1942 la demandante había comprado ciertos renglones de mercancías a un costo que resultaba mayor que el precio máximo a que debía venderlos y se dirigió a la Oficina de Administración de Precios para que se le autorizara a vender dichos renglones con el aumento necesario para evitar una venta a menos del costo. En ese entonces la demandante visitó la Oficina de Precios y fué atendida por un oficial de dicha Oficina a quien fué dirigida. Dicho oficial autorizó a la demandante a vender esos

renglones a determinados precios más altos.  Posteriormente resultó que tal acción era incorrecta y que si bien había un medio de permitir a la demandante vender a un precio que evitara ventas a menos del costo, era necesario seguir ciertos trámites reglamentarios que obviamente no se siguieron por dicho oficial de la Administración de Precios ni por la demandante.

"Las violaciones imputadas a la demandante en junio de 1943 ascendían a unos $26,000.  Al revisar sus facturas según le pidiera la Administración, la demandante encontró que por errores y omisiones involuntarias había incurrido en violaciones en otros renglones misceláneos no imputadas, y voluntariamente ofreció la restitución a Estados Unidos de todo el sobreprecio cargado montante en total a unos $30,000.  La acción de triples daños con que la Administración amenazaba a la demandante ascendía a unos $75,000.  Fuera del pago de los $30,000 contra la demandante no se instituyeron procedimientos otros algunos criminales o civiles ni administrativos relacionados con las alegadas violaciones."

Esa opinión también contiene las conclusiones especiales de hechos que pasamos a copiar en seguida:

"(a)  La cantidad de $30,000 pagada por la demandante a la Oficina de Administración de Precios objeto de este pleito no fué una penalidad criminal o civil, sino una restitución, en este caso a Estados Unidos, de sobreprecios cobrados.

"(b)  Partiendo de la base de la acción tomada en el caso de autos por el Administrador de Precios, transigiendo administrativamente su acción de triple daño por una de daño simple o restitución del sobreprecio, sin haber siquiera instituído la correspondiente acción en corte; el no haber radicado procedimiento criminal contra la demandante por violación de los reglamentos, y el no haber tomado ninguna otra acción punitiva, ya fuera en corte o administrativamente, el Tribunal concluye que se trató de violaciones técnicas y no de violaciones intencionales de la ley con el objeto de no cumplir la misma, o de actuaciones tan crasamente negligentes y descuidadas de la demandante que equivalieran a una violación intencional."

Luego de referirse al caso de *Jerry Rossman Corporation* v. *Commissioner of Int. Rev.*, 175 F.2d 711, el tribunal a quo manifestó que entendía que el pago de $30,000 a la O.A.P. era deducible como un gasto ordinario de la demandante en el

curso corriente de los negocios y que "la manera en que el administrador de precios manejó la situación establece un índice, y nos da base para concluir que en opinión del administrador no se trataba de violaciones intencionales y criminales del estatuto." Indicó asimismo que, "hemos llegado a la conclusión de hecho, por la naturaleza de la acción del Administrador, que no se trata en este caso de una penalidad siquiera civil y sí de una restitución dentro del plan de funcionamiento de las leyes de precios. Pero aun cuando le dejáramos el nombre de 'penalidad' que le da el Secretario de Hacienda, entendemos que el desembolso fué consecuencia de la explotación de una industria o negocio ... y considerando que en este caso en particular la violación se debió en parte a la acción errónea de funcionarios de la propia oficina de Administración de Precios, el pago resulta uno *ordinario* y como tal es deducible."

No conforme con la sentencia así dictada, el Secretario de Hacienda apeló. En su alegato radicado en apelación insiste en que el Tribunal Superior erró (1) al no distinguir el presente caso del de *Rossman, Corp.*, supra; (2) al no resolver que la demandante no tomó las precauciones necesarias y que corrientemente una persona hubiese tomado para evitar la violación; (3) al no resolver que en el presente caso "no se trataba de un reglamento complicado en cuanto a la demandante concernía, que hiciera factible el que cualquier contribuyente en circunstancias similares a las de la demandante pudiera incurrir en la misma violación de manera que tal violación pudiera resultar un acto ordinario, y por ende que el gasto incurrido en la misma fuera un gasto ordinario a la par que necesario"; y (4) al resolver que el pago al gobierno federal de los $30,000 aquí envueltos constituían un gasto ordinario y necesario del negocio de la demandante.

En nuestra opinión el tribunal sentenciador no incurrió en los errores imputádosle. Ya sabemos que habiendo adquirido cierta mercancía a precios más altos que los máximos

fijados por la O.A.P., la demandante acudió a las oficinas de ésta en San Juan y que luego de entrevistarse con uno de los oficiales de ésta, ella fué autorizada a vender la mercancía en cuestión con un 10% de beneficio; que por resultar a la postre nula tal autorización, la O.A.P. notificó a la demandante que ella había incurrido en violaciones de su reglamento, por lo que era conveniente celebrar una conferencia sobre la materia; que se celebraron varias conferencias sobre el asunto y que como resultado de esas conferencias la demandante pagó a la O.A.P. la suma de $30,000. La médula de la cuestión que nos ocupa es si ante semejante situación de hechos la contribuyente tiene derecho a deducir los $30,000 así pagados, como un gasto ordinario y necesario incurrido por ella durante el año contributivo de referencia en la explotación de su industria o negocio. (⁴)

El de *Jerry Rossman, Corp.* v. *Commissioner of Int. Rev.*, supra, citado por el tribunal a quo es sin duda un caso normativo en la materia. Al iniciar su opinión, el Juez Learned Hand, como portavoz de la Corte de Apelaciones de los Estados Unidos para el Segundo Circuito, manifestó que el caso sólo envolvía la cuestión de "si la contribuyente tenía derecho a deducir un pago hecho a los Estados Unidos durante el año en cuestión (1943), bajo las circunstancias que se expondrían." Esas circunstancias fueron que la contribuyente se dedicaba a teñir telas que encogían y al venderlas cobró precios en exceso de los autorizados por los reglamentos de la O.A.P. Aunque la O.A.P. no había iniciado investigación alguna al efecto, el presidente de la corporación inquirió de

---

(⁴) La sec. 32 (a) de la Ley de Contribuciones Sobre Ingresos dispone en lo pertinente que:

"Al computar el ingreso neto de una corporación o sociedad sujeta a la contribución impuesta por la sección 28, se admitirán como deducciones:

"(1) Todos los gastos ordinarios y necesarios pagados o incurridos durante el año contributivo en la explotación de cualquier industria o negocio, ..."

Para la interpretación de la frase gastos ordinarios y necesarios (*ordinary and necessary business expenses*) véase 30 Words & Phrases, ed. permanente, pág. 164.

esa oficina qué debía hacer. El funcionario con quien él se entrevistó le sugirió que devolviera los sobreprecios a los compradores, mas ello no fué posible debido a que éstos habían pasado tales sobreprecios a los consumidores. Por tal razón, el funcionario se avino a que la contribuyente transigiera la controversia pagando a los Estados Unidos el monto total de los sobreprecios y así lo hizo la corporación. La suma pagada constituía precisamente la deducción en controversia. Luego de exponerse esas circunstancias, se indica en la opinión que surgían tres cuestiones: (1) si el pago podía ser considerado como una "penalidad"; (2) suponiendo que pudiera así considerársele, si las "penalidades" son deducibles como gastos ordinarios y necesarios; y (3, si siendo algunas penalidades deducibles y otras no, la penalidad en disputa se encontraba entre las que podían ser deducidas. También se indica en ella que era aparente que el pago de los sobreprecios—que era cuanto estaba envuelto en el caso—no podía bajo teoría alguna, ser considerado como el pago de una penalidad "y que tomada en su sentido más alto esa palabra (penalidad) tenía un significado punitivo, en contraposición a uno reparativo"; que si a la contribuyente le hubiera sido posible devolver los sobreprecios a los compradores finales, y así lo hubiera hecho, tal distribución hubiera sido deducible; y que ésta no se efectuó porque ello le fué imposible, pero que en su lugar se pagaron los sobreprecios al acceder el administrador a no exigir otra cosa. Asimismo se indica en la opinión que aceptando que al expresarse en los términos anteriores se estuviera equivocado y que el pago pudiera ser considerado como una penalidad, la segunda cuestión a determinarse era si bajo cualesquiera circunstancias podía considerarse el pago como un "gasto ordinario y necesario" del negocio; que la ley de rentas internas no declara que las penalidades no son deducibles; que la doctrina es una glosa judicial de tribunales inferiores, excepción hecha de que el Tribunal Supremo la reconoció por inferencia en el caso de

*Commissioner* v. *Heininger*, 320 U. S. 467, 88 L. Ed. 171, pero que estaban de acuerdo en que era una glosa adecuada; que en síntesis había "penalidades" y "penalidades", algunas de las cuales eran deducibles y otras no; que en cada caso la cuestión tenía que ser resuelta *ad hoc*, y que ésta conclusión les llevaba directamente al tercer punto, a saber: si aceptando que el cobro de los sobreprecios equivalía a una "penalidad", el permitir la deducción de la misma, frustraba cualquier política claramente definida por la Ley de Emergencia para el Control de Precios. Se admite entonces en esa opinión que el grupo de reglamentos a virtud de los cuales el gobierno de los Estados Unidos trató de tener el control de precios durante la segunda guerra "era extraordinariamente complicado y difícil de comprender"; que eso era inevitable, dada la innumerable variedad de transacciones mercantiles a ser cubiertas por ellos; que al considerar en 1944 la enmienda a la sec. 205 (*e*) el administrador de la O.A.P. declaró en una carta dirigida al comité del senado que entendía en la cuestión "que la protección de infractores inocentes contra daños excesivos era altamente deseable"; y que su práctica había sido transigir los casos de infractores inocentes mediante el pago de los sobreprecios; que al enmendarse esa sección en dicho año (1944), el Congreso convino con el administrador. Se sigue entonces diciendo en la opinión que: "nos parece que debemos aceptar esas expresiones como evidencia de que en casos en que el administrador acepta como suficiente el monto de los sobreprecios, ello no 'frustra' ninguna política 'claramente definida' de la Ley de Emergencia para el Control de Precios de 1942." Concluye el Tribunal de Apelaciones indicando que bajo ninguna teoría puede considerarse el pago de los sobreprecios a los Estados Unidos como el pago de una penalidad; que aún si tal pago equivalió a una "penalidad", ello no constituye un criterio rígido para la determinación de su deducibilidad; y que existía prueba positiva y concluyente de que el conceder tal

deducción no "frustaría la política de la ley en cuestión...
Sin embargo, la avenencia del administrador a aceptar los
sobreprecios demuestra que él creyó que la contribuyente,
como cuestión de hecho, había ejercido el debido cuidado, y
eso bastaba." *Cf. Buscaglia* v. *Tribl. Contribuciones, Fajardo Sugar Co., interventora*, 68 D.P.R. 858, 862.

El criterio así enunciado en el caso de *Rossman*, supra,
ha sido seguido por otros casos. Véanse *National Brass
Works* v. *Commissioner of Int. Rev.*, 182 F.2d 526; Id. 205
F.2d 104; *Commissioner of Int. Rev.* v. *Pacific Mills*, 207
F.2d 177; *Utica Knitting Co.* v. *Shaughnessy*, 100 F. Supp.
245; *Hershey Creamery Co.* v. *United States*, 101 F. Supp.
877; *Farmers Creamery Co.* v. *Commissioner*, 14 T.C. 879;
*Cf. Bowles* v. *Hageal*, 64 F. Supp. 294; *Mercado* v. *Brannan*,
173 F.2d 554; *Henry Waterson Hotel Co.* v. *Commissioner*,
15 T.C. 902.

Estamos enteramente contestes con lo resuelto en el de
*Jerry Rossman Corp.* v. *Commissioner of Int. Rev.*, supra,
y por los casos que le han seguido. Al igual que en aquél, la
violación por la demandante de los reglamentos de la O.A.P.
no fué intencional. La prueba lo demuestra. Ella acudió—
así concluyó el tribunal sentenciador—a uno de los oficiales
de dicha oficina y siguió el consejo de éste. Aunque tal con-
sejo resultó ineficaz, lo cierto es que teniendo dudas la de-
mandante recurrió ante una fuente oficial y se ciñó al consejo
allí dádole. Es incuestionable que la demandante pudo haber
hecho más de lo que hizo, ajustándose a lo dispuesto por los
reglamentos de la O.A.P. para casos similares, mas no puede
decirse que el no proceder así la convierta en una infractora
voluntaria de tales reglamentos y que por ende el pago hecho
no es deducible. En el caso de *Rossman*, lo mismo que en el
presente, se trataba de la restitución o devolución de sobre-
precios. En ese sentido ambos casos son similares. No ha-
bía por tanto que distinguir este caso de aquél, sino armo-
nizarlos. Las sumas pagadas en uno y otro eran deducibles

como gastos ordinarios y necesarios del negocio o industria. Al igual que en aquél la deducción aquí reclamada no frustra en forma alguna la política claramente definida de la Ley de Emergencia para el Control de Precios.

*La sentencia apelada será confirmada.*

